**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:11-CR-77(12)-PPS-APR |
| v. | ) | |
| | ) | |
| ARMANDO JOSE VELASQUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

In this RICO prosecution, Armando Velasquez has moved to suppress identification testimony by witnesses who have identified him as the person responsible for a gang related shooting. [DE 263]. Velasquez argues that identifications made by two witnesses using photo lineups were overly suggestive, and therefore any in-court identification testimony would be tainted by the prior suggestive photo lineups. Because the photo lineups shown to the witnesses were not overly suggestive, the motion to suppress is **DENIED**.[1]

**BACKGROUND**

Velasquez, with twelve other co-defendants, has been charged in the second superseding indictment in this case [DE 151]. As pertinent to this motion, Velasquez has been charged in Count One with conspiracy to participate in racketeering activity in violation of 18 U.S.C. § 1962(d). One of the overt acts alleges that Velasquez attempted to murder "Victim 5" by shooting him multiple times with a firearm on December 3, 2011. Count 24 charges Velasquez with a substantive violation relating to the same attempted murder. *See* 18 U.S.C. § 1959(a)(5).

---

[1] Defendant Velasquez's Motion to File Instanter Post-Evidence Hearing Brief in Support of the Motion [to] Suppress Identification Evidence [DE 543] and Motion to Correct Typographical Error in Post-Evidence Brief [DE 545] are **GRANTED**.

Count 25 charges him with use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

Velasquez's motion to suppress concerns testimony and evidence obtained when police officers investigating the December 3 shooting interviewed witnesses and then showed them photo arrays that included pictures of Velasquez, who the witnesses identified as the shooter. The parties also submitted post-hearing briefing. I'll start with the facts as adduced at the suppression hearing, where the government called one witness to testify: Detective Clarence R. Anderson of the East Chicago Police Department.

On December 3, 2011 at approximately three in the afternoon on the south side of East Chicago, four individuals got in a car outside the home of the driver, Terrance Rios. They were heading to the River Oaks Mall. As they were pulling away from the house, Rios's mother asked him if he would go to the store and bring her back a soda. Rios was in the driver's seat. Witness 1[2], who is sixteen years old, was sitting in the front passenger seat of the vehicle. Witness 2, who is fifteen years old, was sitting directly behind the driver in the back seat of the car. Witness 3 was sitting behind Witness 1 in the back seat.

The men in the car drove to a corner store at 150th Street and Magoun Avenue and parked in front of the store. According to the witnesses, Rios got out of the car to go into the store. The witnesses saw a man who was standing outside the store follow Rios inside. When Rios came out of the store, the man emerged and appeared to be talking to Rios, who just continued walking toward the car. The man walked up to the car and looked into the windows. Rios told the man to back up, and the man did so. Rios got back into the car, and they drove away. According to

---

[2] The identities of the witnesses have been withheld for security purposes.

Witnesses 1 and 2, Rios told his passengers that the man said something to him like "What's up with your guys in the car?" and that Rios responded "Ain't nothing up with them, what's up with you." They drove back to Rios's house to deliver the soda to his mom, and after doing so, left again to head to the mall.

Rios drove the car southbound on Baring Avenue and approached a stop sign at the intersection of Baring and 150th Street. Witness 1 had his head turned toward Rios. As the car stopped at the stop sign, he turned his head to look out the passenger side window, and he saw a man walking up to the passenger side of the vehicle. He pulled out a silver or chrome semiautomatic pistol. Witness 2 saw the shooter crossing the street as the car stopped at the stop sign. When he made it to the sidewalk, the car came to a complete stop, which was when the man began shooting. Witness 1 ducked, which was when the gun shots went off; he heard eight gunshots. Witness 2 said that he heard more than five shots. Witness 1 told Rios to go, but the car wasn't moving. After two gunshots, Witness 1 pushed Rios's leg down on the gas pedal and tried to steer the car down the street to the next corner. The passengers got out of the car and called 911. The passengers did not see where the shooter fled.

Detective Anderson, a twenty-two year veteran of the City of East Chicago Police Department, responded to the scene. According to Detective Anderson, the 149th Street Set of the Imperial Gangsters street gang is active in the neighborhood. When he arrived on the scene approximately a half hour after the shooting, patrol officers and supervisors had already secured the area. Detective Anderson was briefed by a Sergeant Jose Rivera, who relayed that there had been a shooting involving a vehicle with four passengers, one of whom had been shot and three of whom had witnessed the shooting. Rios had been taken to the hospital and the three witnesses

had been taken to the police station. Detective Anderson was also apprised that a video might exist of the shooting: officers investigating the shooting, who were part of the Gang and Narcotics Unit, were familiar with a nearby resident who used surveillance cameras on his property and might have footage of the shooting.[3]

Detective Anderson left the scene of the shooting and attempted to obtain the footage. The home was approximately a half block away from where the shooting occurred. The homeowner showed Detective Anderson his surveillance footage, and Detective Anderson was able to see the shooting on the video. He returned to the residence later with VCR equipment to duplicate the footage.

At the evidentiary hearing, the government presented the video footage. The video, which is time stamped, shows that the shooting occurred at 4:32 p.m. The video depicts the intersection of 150th Street and Baring Avenue. It appears to be near dusk: some of the cars visible on the video have their headlights on, though not all. The neighborhood street lights are not on prior to the shooting. A person is clearly visible walking west on the south side of 150th Street. He crosses the intersection and turns right to cross to the north side of 150th Street. As he does so, a car without its lights on travels southbound on Baring Avenue, approaching the intersection with 150th Street. As the car stops at the stop sign, the person on foot runs toward the passenger side of the vehicle, pulls a gun and starts shooting. A muzzle flash is clearly depicted in the video. The car moves forward and sharply to the left through the intersection, and the shooter continues running after the car and shooting. As the car veers toward the curb at

---

[3] The gentleman with the surveillance cameras is in fact the father of one of Velasquez's codefendants in this case, Galo Benjamin Feliciano. Because of their previous dealings with Defendant Feliciano, the Gang and Narcotics Unit officers asked Detective Anderson to approach Feliciano's father to try to obtain the videotape instead of doing so themselves.

the southeast corner of 150th and Baring, the shooter retreats and runs westbound on the north side of 150th Street. The car continues southbound on Baring. At the hearing, Detective Anderson confirmed that Defendant Velasquez lives approximately two blocks from where the shooting occurred, and that the shooter fled in the direction of Velasquez's home.

After viewing the surveillance tape, Detective Anderson checked to see if a nearby corner store was open, but it was not. He then proceeded to the hospital to check on Rios's condition. At that point, Detective Anderson was under the impression that Rios would not survive, and treated the investigation as a potential homicide.

In a subsequent interview later that day with Detective Anderson, Witness 1 described the shooter as wearing a black hoodie with the hood up, jeans, and white shoes. He said that the shooter was a Hispanic male, in his mid to late twenties. He said the shooter had a scraggly beard that was not thick, with a goatee mustache, and a haircut that was dark on the top and faded on the side. The day of the shooting was the first time that Witness 1 had ever seen the man. Witness 1 told Detective Anderson that he got a look at the shooter's face, and that he could identify the shooter if he saw him again.

Witness 2 also described the shooter as a Hispanic man wearing a black hoodie, jeans, and white shoes. He was not sure if the hoodie was up or down. He estimated that the shooter was 25 or in his late twenties, with a fade haircut and a beard that was not full, but that was trimmed up. He was not sure if the shooter had a mustache. He estimated that the shooter was about 5'5" or shorter. The shooter kept the gun in the pocket of his hoodie. Witness 2 also told Detective Anderson that two or three weeks before the shooting, he was walking down 151st Street toward the Calumet housing projects when he saw the shooter walking towards him,

wearing a black hoodie. The shooter asked Witness 2 "where you from, fam" and "what you is." Witness 2 told the shooter that he was just a "little kid" and continued walking. (Recall that Witness 2 is 15 years old). Witness 2 said that he was able to observe the shooter's face during the exchange. Detective Anderson testified at the hearing that based on his experience investigating gangs, the meaning of the exchange was that the shooter was trying to find out what neighborhood Witness 2 was from, and whether he was in a gang.[4] Witness 2 told Detective Anderson that he was sure that he would be able to identify the shooter in a photograph.

Detective Anderson also interviewed Witness 3 on December 3, 2011. Witness 3 was in the rear passenger seat in the car. He told Detective Anderson that when the car pulled up to the store, the shooter was standing outside and that he did not have his hood up. He also told Detective Anderson that the shooter did not have long hair.

After concluding the interviews of Witnesses 1, 2, and 3 on the day of the shooting, Detective Anderson did not show them photo lineups. However, he had a possible suspect: Armando Velasquez, whose name had been given to Detective Anderson by East Chicago Gang Unit officers Sergeant Rivera and Detective Nate London. Detective Anderson did not tell the witnesses Velasquez's name. Police went out that night to try to find Velasquez, who had an open arrest warrant for an unrelated incident. Though they did not find him at his residence, they were able to do a consent search of the residence, where they found a picture of the Pink Panther, the Imperial Gangsters' mascot, and a rifle in his closet.

---

[4] Both Witness 1 and Witness 2 said that no one in the vehicle was affiliated with a gang, which Detective Anderson said was borne out by his investigation.

Three days after the shooting, on December 6, 2013, Detective Anderson showed Witnesses 1 and 2 photo lineups. Witness 3 was not shown a photo lineup because his parents objected. Detective Anderson assembled the photo lineups himself by pulling police booking photos from the East Chicago Police Department computer system. Detective Anderson testified that in addition to the photograph of Velasquez, he included five photographs of Hispanic men with facial hair, as the witnesses had described. He testified that he selected photos that were similar to the booking photo of Velasquez that he was using in the array. He selected photographs that were taken in front of similarly-colored backdrops: three are a light gray and three others are a darker gray. The array consisted of two rows of three photos each.

When showing the photo array to Witness 1, Detective Anderson admonished him that the individual that the witness had seen might or might not be in the array. Witness 1 identified Velasquez as the shooter. Detective Anderson testified that Witness 1 picked out Velasquez "right away," that he had no hesitation, and that he appeared certain.

Detective Anderson also showed the array to Witness 2. The images were placed in a different order for Witness 2, but other than that, Detective Anderson gave the same instructions to Witness 2 as he gave to Witness 1. Witness 2 also identified Armando Velasquez as the shooter. Detective Anderson testified that he did not hesitate or equivocate in making the identification, and that he was certain that he properly identified the shooter.

On December 13, 2011, Detective Anderson interviewed a female employee working the cash register at the store where Rios stopped and encountered the shooter. She told Detective Anderson that she remembered Rios and that she had seen him in the store on other occasions. She did not recall anyone coming into the store with Rios, but she told Detective Anderson that
-7-

she was helping other customers at the time. Detective Anderson asked her if any Hispanic male in a black hoodie came into the store before Rios. She recalled that a shorter man had come in that day, but said that it was approximately an hour before Rios came in. The person came into the store to buy cigarettes. She did not know him personally, but described him as wearing a black hoodie, jeans, about 18 years old, light-skinned, 5'1" or 5'2", and with a "low hair cut, combed back a bit." The cashier further told Detective Anderson that because the man's hood was up when he came in, she did not see if he had a ponytail or not, but that he had come into the store before and that he had hair that was "slicked back." She also told Detective Anderson that the man in the black hoodie did not have facial hair.

Detective Anderson showed the cashier a photo array containing the same pictures that he showed to Witnesses 1 and 2. She told Anderson that the man in the black hoodie "had shorter hair." Detective Anderson then told her not to pay attention to the hair because there was a discrepancy among the witnesses about the suspect's hood being up or down. Anderson testified that he instructs witnesses to "focus in on facial features, and not only the hair on the particular individual in some cases." The store cashier was unable to make an identification.

Following Armando Velasquez's arrest on December 14, 2011, his photo was taken for booking purposes. In his booking photo, Velasquez has long dark hair that is in several thin braids off of his face, with lighter patches in between the braids. At the time of his arrest, Velasquez had a mustache and goatee, with thinner areas of facial hair along his jawline. He was 5'2" tall.

**DISCUSSION**

Velasquez has moved to exclude the testimony of Detective Anderson, who showed the shooting witnesses the photo arrays, as well as the testimony of the witnesses themselves. Velasquez has two arguments: first, he contends that the out-of-court identifications should be barred because they were overly suggestive; and second, he seeks to exclude any in-court identification testimony by those witnesses because such identifications would be tainted by the suggestive photo arrays.

Velasquez raises a number of arguments in support of his argument that the photo lineups were suggestive. He says that the government overlooked conflicting testimony between witnesses regarding facial hair, size, weight, and complexion and only showed the photo arrays to certain witnesses [DE 263 at 2]. Additionally, he argues that the shooting took place at sundown, and the witnesses to the shooting therefore would have been unable to observe the shooter clearly [*Id.*]. Velasquez points to the fact that Detective Anderson showed the same photo array to the store cashier and instructed her to disregard the facial hair of the individuals depicted to prove that Detective Anderson knew that the other identifications had been somehow tainted [DE 541 at 4-6].

When evidence against a criminal defendant is "so extremely unfair that its admission violates fundamental conceptions of justice, due process, like the sleeping giant, awakens" to exclude the evidence. *United States v. Sanders*, 708 F.3d 976, 983 (7th Cir. 2013) (internal citations and quotations omitted). One category of such unreliable evidence is unduly suggestive identification procedures. *Id.* Due process is implicated when there is a "very substantial likelihood of irreparable misidentification." *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 198

(1972)).  To determine whether due process requires exclusion, courts should first consider "whether the identification procedure used by law enforcement was 'both suggestive and unnecessary.'"  *Id* at 983-84 (quoting *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012)); *see also United States v. Gallo-Moreno*, 584 F.3d 751, 757 (7th Cir. 2009).  Second, if the identification procedure was suggestive, then the court should examine the totality of the circumstances "to determine whether other indicia of reliability 'outweigh[ ] . . . the corrupting effect of law enforcement suggestion.'"  *Sanders*, 708 F.3d at 984 (quoting *Perry*, 132 S.Ct. at 725); *see also Gallo-Moreno*, 584 F.3d at 757.  In this second step, the court's role "is to determine whether the identification was so unreliable that the defendant's constitutional right to a fair trial should have precluded its admission."  *Gallo-Moreno*, 584 F.3d at 757 (quoting *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009)).  But the test for excluding identification testimony is a demanding one and exclusion of such evidence is very much the exception, not the rule.  *United States v. Ford*, 683 F.3d 761, 766 (7th Cir. 2012) (quoting *Perry*, 132 S.Ct. at 720).

**I.      The procedure was neither suggestive nor unnecessary**.

The Seventh Circuit has prescribed a number of ways to ensure that photo arrays are not suggestive.  At the risk of stating the obvious, the most basic protection against an unduly suggestive lineup is to ensure that the photographs are of similar-looking people.  *Ford*, 683 F.3d at 766.  The Seventh Circuit has also endorsed a procedure whereby law enforcement offers a "sequential array" – that is, shows the witness the photos one by one.  *Id.* at 765.  The idea behind the sequential array is that a witness shown the pictures individually is more likely to compare each photo to his or her memory of the offender, and less likely to just pick which

person in the photo array looks the most like what the witness recalls. *Id.* Additionally, best practices include giving the witness a disclaimer that the suspect's photo might not be among the photos shown to the witness; making it appear to the witness that there are more photos in the array than have been shown; and assigning officers to conduct the photo array who are different than the officers investigating the case. *Id.* at 765-66.

Although Velasquez failed to even cite to *Ford* in his original motion, in his post hearing brief he puts much weight on the *Ford* court's admonishment that an array would be "less suggestive" if a witness was shown photos "one by one." *Id*. at 765. But Velasquez ignores the rest of the facts in *Ford*: the witness had only seen a masked man, and the photo array did not include such facial coverings; the other five men in the array did not look like the defendant and lacked freckles, the most obvious physical characteristic that the witness described. *Id.* Most alarmingly, sixteen months had passed between the crime and the witness's viewing of the photo array. *Id.* at 764. Finally, while *Ford* is critical of simultaneous photo arrays, it did not say that such a procedure is *per se* suggestive.

In this case, I am satisfied that the use of the non-sequential photo array was not in and of itself suggestive. The witnesses were admonished that the shooter might or might not appear in the photos that they were about to view. The photo array contained images of six Hispanic men with similar complexions,[5] each with a similar build, dark hair that was somewhere between ear- and shoulder-length, a thin mustache, and a goatee. This stands in stark contrast to *Ford*, where the suspect was the only light-skinned, freckled man. Though the practice of showing

---

[5] The photo at position five in the photo array appears to possibly be African-American, but Detective Anderson testified that the photo is of a darker-skinned Hispanic man.

simultaneous photo arrays in lieu of sequential ones may no longer be advisable, I do not find that it is automatically unduly suggestive, especially in light of the other safeguards observed in this case.

Velasquez also argues that the witnesses' statements describing the shooter were inconsistent, and as a result, his inclusion in the photo array was "result-oriented" [DE 263 at 3]. Specifically, at the hearing and in his post-hearing brief, he contends that the witnesses provided differing descriptions of the shooter's hair and facial hair, which the police ignored to "engineer" the result that the witnesses would identify Velasquez – all because the police had such a strong desire to get Velasquez charged in the second superseding indictment in the present case. The evidence of that theory is scant at best. Velasquez is correct that the witnesses universally described the shooter as having a "fade" haircut, which is longer (and therefore darker and more dense) on the top of the head and shorter, lighter, and less thick on the sides of the head. But as the government correctly notes, a description of a fade haircut isn't entirely inconsistent with Velasquez's braided hairstyle, especially when coupled with the fact that the shooter was described as wearing a hooded sweatshirt [DE 554 at 3]. While there was differing testimony about whether the hood was up or down, even if the hood was down and the witnesses could see the top of the shooter's head, it's entirely plausible that the extra fabric from the hood obscured any braids or hair that was hanging down. In any event, all of these discrepancies are best addressed in cross-examination.

Moreover, the testimony regarding the facial hair was consistent among the witnesses to the shooting: they universally described a thinner, scraggly beard with hair around the mouth. It is true that the store cashier told Detective Anderson that she saw a person with a black hoodie

and no facial hair come into the store, but she also said that the person came in long before Rios. Velasquez claims that the police admonishment to the store cashier to disregard the hair in the photo array is evidence that the police knew that they had problems with the previous identifications, and was in itself suggestive. But it seems rather clear that the store cashier was describing a person who was in the store at some point well before Rios came in. She told the police that when Rios did come in, she was distracted because she was helping other customers. Moreover, she wasn't interviewed until ten days after the shooting. And in any event, she didn't make an identification; this is "some evidence" that the array was not suggestive. *Ford*, 683 F.3d at 766 (citing *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998)).

Because the photos in the array all looked similar to the photo of Velasquez, the witnesses were instructed that the shooter might not appear in the photo array, and the store cashier appears to have been describing someone other than the shooter and failed to make an identification even after she was admonished to disregard the hair in the pictures, I find that the identifications were not the result of suggestive police practices.

**II.     Under the totality of the circumstances, the identifications are reliable.**

Even if I were to find that the use of the non-sequential photo array was suggestive and unnecessary, the identification would not be automatically excluded. Rather, as mentioned above, "[i]f the petitioner successfully demonstrates that the challenged procedure was unduly suggestive, the court must then determine, under the 'totality of the circumstances,' whether the identification was sufficiently reliable to prevent misidentification." *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003).

In determining the likelihood of misidentification, I need to consider the five so-called

*Biggers* factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.  As outlined below, I find that even if the photo arrays were somehow suggestive and unnecessary, the totality of the circumstances indicates that the identification testimony is sufficiently reliable to prevent misidentification and is therefore admissible.

First, the evidence is clear that the witnesses had sufficient opportunity to view the criminal at the time of the crime and that their degree of attention was high.  Though these factors are separated under the *Biggers* analysis, it makes sense in this case to examine them together.  These factors support reliability where the witness is able to look the defendant "straight in the face . . . at close range . . . with a presumably high degree of attention." *United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999) (identification reliable where witness had only a "short time" to view the defendant); *see also United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995) (identification reliable where witnesses "got a good look" at defendant when they were standing "just a few feet from him and looking right at him for a matter of minutes"). When a witness indicates that he or she got a "good look" at the defendant, this factor favors reliability.  *United States v. Griffin*, 493 F.3d 856, 866 (7th Cir. 2007); *Daniels*, 64 F.3d at 315. Moreover, where, as here, the witnesses are observing the defendant in the commission of a crime – especially one of violence – courts have presumed that their attention is sufficiently drawn to the defendant.  *See, e.g.*, *Griffin*, 493 F.3d at 866; *Curry*, 187 F.3d at 769; *United States v. Fryer*, 974 F.2d 813, 821 (7th Cir. 1992).

Witnesses 1 and 2 were both seated in Rios's car at the convenience store when the shooter walked so close to the vehicle and looked in through the windows that Rios told him to back up – an event that would certainly have drawn the passengers' attention to the person. To that point, both Witnesses 1 and 2 told Detective Anderson that they would be able to identify the shooter if they saw him in a picture. Moreover, though Velasquez argues that because sundown occurred at 4:20 p.m., the witnesses could not have seen the shooter clearly, he also submitted evidence that twilight ended at 4:51 p.m. – well after the shooting took place. The video footage showed that there was sufficient light to observe what was happening, and the street lights were not yet on when the shooting occurred. There was presumably even more light when the shooter walked directly up to Rios's car in the parking lot of the convenience store, giving the witnesses a clear look at him. Finally, though the witnesses acknowledged that they ducked when the shooter began firing, the video evidence makes clear that the shooter walked very close to the car before discharging his weapon, giving the witnesses opportunity to view him – indeed, both Witnesses 1 and 2 identified the shooter as the person they had seen at the convenience store.

In addition to viewing the shooter at the convenience store and at the scene of the shooting, Witness 2 told Detective Anderson that he had seen the shooter a third time, two or three weeks prior to the shooting, and had a conversation with him. In addition to being in close proximity to the shooter on December 3, Witness 2 was also able to observe the shooter's face during the earlier exchange. The evidence is therefore strong that Witnesses 1 and 2 had sufficient opportunity to view the shooter, and that their attention was drawn to him.

As to the accuracy of the description of the shooter, the witnesses gave a somewhat clear

description that matches Velasquez. They told police that the shooter was a Hispanic male, in his mid- to late-twenties, with light facial hair, and Witness 2 said that the shooter was about 5'4" or shorter – all of which match Velasquez's physical appearance. As discussed above, however, the witnesses to the shooting described the shooter as having a fade haircut, which Velasquez clearly does not have. Nonetheless, a hoodie-sporting Velasquez could certainly have been mistaken for having a fade instead of a longer, off-the-face, braided hairstyle.[6] And in any event, one or two inaccuracies about a defendant's physical characteristics does not mean that the identification is unreliable. *See Johnson v. McCaughtry*, 92 F.3d 585, 596 (7th Cir. 1996) (identification upheld where witness initially described robber as shorter and younger than defendant he eventually identified); *United States v. Brownlee*, 454 F.3d 131, 139-40 (3d Cir. 2006) (witnesses' initial descriptions of assailant as being younger and wearing different clothes than defendant did not render identification unreliable).

Even if I were to find that this factor favored Velasquez (which I don't), it is only one of the *Biggers* factors and would not render the identification unreliable. At the very least, the matter of Velasquez's hairstyle and how it affected the identification process here is a matter of the weight that the jury should assign to this evidence, not a bar to admissibility.

Velasquez argued at the hearing that the use of photographs of long-haired individuals, which was contrary to the witnesses' descriptions, was done because Velasquez was inexplicably a person of interest and that Detective Anderson "engineered" the selection of photographs to

---

[6] Velasquez has also argued that there is a high concentration of Hispanic men living in the area, and that the witnesses' description of a Hispanic man fails to explain how the police began targeting Velasquez in their investigation [DE 541 at 7]. This argument, however, does not go to the suggestiveness of the identification. It is also undercut by evidence presented at the hearing that the shooter was seen fleeing the scene of the shooting in the direction of Velasquez's nearby residence. If anything, this argument goes to the weight, and not the admissibility of the identification.

resemble a recent booking photo of Velasquez. But this argument misses the point: Velasquez looked similar to the individuals in the photo array. The night of the shooting, the police determined that the shooter had fled in the direction of Velasquez's residence, which was in the immediate vicinity of the shooting; that the shooting had the hallmarks of a gang shooting and that Velasquez was likely a member of the Imperial Gangsters; and that the witnesses had in fact described a person – albeit with a fade haircut – with features very similar to Velasquez. Other than sheer conjecture, there is no evidence whatsoever to support Velasquez's theory that the police had a strong desire to include him in the second superseding indictment in this case and thus "engineered" a photo array to achieve that result. I find that this factor supports the reliability of the witnesses' identifications.

The fourth *Biggers* factor is the certainty of the witness's identification: where a witness makes an identification with certainty, this factor favors reliability. *Griffin*, 493 F.3d at 866; *Curry*, 187 F.3d at 769. Even a lack of uncertainty has been held sufficient to support the reliability of an identification. *Recendiz*, 557 F.3d at 526. The government states in its brief that this factor is now looked upon with disfavor because "a victim's level of certainty may be the product of an unduly suggestive identification technique and has no correlation to the identifications' accuracy" [DE 285 at 16]. Velasquez did not address this issue. The government cites *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) for this proposition, and while it is true that the Seventh Circuit was critical of this factor in *Phillips*, that case was a § 1983 action for false arrest and imprisonment – not a criminal matter. Moreover, it involved probable cause for an arrest and claims for damages against arresting officers, not the admissibility or reliability of photo identification testimony. While the *Phillips* court did address

the challenges to the certainty prong of the *Biggers* test and noted that research in the social sciences has shown that "the confidence-accuracy relationship for eyewitness identification is weak," it did not hold that this factor should no longer be considered by district courts who are conducting a pretrial screen of identification testimony for reliability in criminal matters. Accordingly, I will assess this factor.

Here, the witnesses were certain in their identifications. When they initially spoke with police on the night of the shooting, both witnesses told police that they could identify the shooter if they saw him again. Though the witnesses themselves did not testify at the hearing, Detective Anderson testified that Witness 1 picked Velasquez out of the array "right away," without hesitation, and that he appeared certain. Detective Anderson also testified that Witness 2 identified Velasquez without hesitation, and without any words of equivocation. This factor supports the reliability of the identifications.

Finally, the length of time between the shooting, the initial police interviews, and the identifications following the viewing of the photo arrays favors the reliability of the identifications. Identifications made months after initial contact with suspects can be reliable. *Fryer*, 974 F.2d at 822 (identifications made two months, two and a half months, and three weeks after robberies were reliable). Here, both Witnesses 1 and 2 spoke with police within hours of their initial contact with the shooter at the convenience store and the actual shooting, at which time they both provided detailed descriptions. They both identified Velasquez in the photo lineups only three days later. Accordingly, the length of time that elapsed between the initial observation of the shooter and the identification was very small, which is further evidence that the identification was reliable.

Each of the *Biggers* factors favors reliability, and I therefore find that under the totality of the circumstances, the identifications were reliable and should not be excluded.

## CONCLUSION

For the reasons above, Defendant Velasquez's Motion to Suppress Identification Evidence [DE 263] is **DENIED**. Defendant Velasquez's Motion to File Instanter Post-Evidence Hearing Brief in Support of the Motion [to] Suppress Identification Evidence [DE 543] and Motion to Correct Typographical Error in Post-Evidence Brief [DE 545] are **GRANTED**.

**SO ORDERED.**
ENTERED: August 8, 2013

> s/ Philip P. Simon
> PHILIP P. SIMON, CHIEF JUDGE
> UNITED STATES DISTRICT COURT